1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT

7          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10   ADVANCED ROTORCRAFT                    No. C 06-06470 WHA
     TECHNOLOGY, INC.,
11
                 Plaintiff,
12
        v.                                  **ORDER DENYING PLAINTIFF'S
13                                           MOTION FOR PRELIMINARY
     L-3 COMMUNICATIONS CORPORATION,         INJUNCTION, AND VACATING
14                                           HEARING**
                 Defendant.
15   _____/

16

17                          **INTRODUCTION**

18        In this copyright-infringement action between defense contractors, plaintiff moves for a

19   preliminary injunction to halt defendant's use of its software allegedly in violation of a license

20   agreement.  Plaintiff has not shown a reasonable likelihood of success on the merits or that the

21   balance of hardships tips sharply in plaintiff's favor.  Accordingly, plaintiff's motion for

22   preliminary injunction is **DENIED**.  Seeing that no further argument is necessary on this motion,

23   the hearing is hereby **VACATED**.

24                           **STATEMENT**

25        Plaintiff Advanced Rotorcraft Technology, Inc. designs, develops, and markets

26   simulator productivity tools and reconfigurable flight simulators for both fixed-wing aircraft

27   and helicopters.  Its products are used for engineering and pilot training (DuVal Decl. ¶ 2).  The

28   products primarily consist of software used by the United States Army, Navy, and Air Force, in

*United States District Court*
*For the Northern District of California*

1    addition to commercial defense companies, aircraft manufacturers, and flight simulator

2    companies (*ibid.*).  Defendant L-3 Communications Corporation also designs and supplies flight

3    simulators for training pilots on fixed-wing aircraft and military helicopters (Genna Decl. ¶ 2).

4    This includes supplying simulators to the United States Army for training pilots for several

5    types of military helicopters currently in service (*id*. at ¶ 3).

6        One of defendant's principal simulator products was the Aviation Combined Arms

7    Tactical Training simulator ("AVCATT") (*id*. at ¶ 5).  The AVCATT simulator provided

8    "combined" training which allowed several pilots to train simultaneously as a team in a

9    networked environment (*ibid.*).  The simulators could be altered quickly to simulate different

10   aircraft, flight conditions, and types of missions (*id*. at ¶ 6).  The AVCATT simulator used

11   software known as a flight dynamics model (*id*. at ¶ 15).  ART supplied a flight dynamics

12   model to L-3 from its FlightLab family of products called the Stand Alone Run Time Library

13   software for use in the AVCATT simulator (DuVal Decl. ¶ 4).

14   *Software Licenses Between ART and L-3*

15       In 2000, the United States Army began soliciting bids for the AVCATT-A program,

16   Government Contract Number N61339-00-C-D002 (*id*. at ¶ 12).  The contract was awarded to

17   L-3.  Initially, it was to supply three or four simulator suites, each containing six flight

18   simulators, and ultimately up to 30 to 40 simulator suites (*id*. at ¶¶ 13–14).  L-3 entered into a

19   license agreement with ART under which ART would supply its FlightLab software for use in

20   the simulators (*id*. at ¶ 15, Cox Decl. ¶ 3).  The original agreement permitted the software to be

21   installed on six computers for a total price of $54,000, or $9,000 per computer (*id*. at ¶ 15).

22       As the AVCATT-A program expanded, L-3 determined that it would be easier and more

23   efficient to stop licensing the FlightLab software on a per-computer basis (Cox Decl. ¶ 4).  In

24   the spring of 2002, parties entered into the project buyout license agreement.  L-3 contends that

25   the project buyout license was for unlimited use of the FlightLab software in any AVCATT

26   simulator, while ART contends that the project buyout license allowed unlimited use of the

27   FlightLab software for only the AVCATT-A Project.  The license fee was $200,000 (*id*. at Exh.

28   3).

United States District Court

For the Northern District of California

2

The license itself allowed the software to be run on an unlimited number of CPUs (computers), in any number of places (*ibid*.).  The license was for a "Specified Project," the "Aviation Combined Arms Tactical Training Simulators" (*ibid*.).  The terms and conditions defined "Specified Project" as "the specific project for which a Project Buyout License has been obtained" (*id*. at ¶ 1.6).  Section 2.3 of the project buyout license also stated (*id*. at ¶ 2.3):

> For a Project Buyout License, the Licensed Program(s) can be used on an unlimited number of computer systems *as long as the utilization is for the Specified Project*.  The Licensee is responsible to insure that no computers operating the Licensed Software under a Project Buyout License are using the Licensed Software in support of any application other than the Specified Project.

Under the license, L-3 was also granted the right to modify, improve, or enhance the licensed program to form derivative or updated works, as long as the software provided by ART was removed from the derivative work when the license was terminated (*id*. at ¶ 6.3).  The license could be terminated for failure to perform with 60 days written notice (*id*. at ¶ 13.0).  The final paragraph of the license stated "[t]his License states the parties' entire agreement with respect to its subject matter.  It supersedes, merges, and renders void any and all other agreements or understandings (oral or written) pertaining to such subject matter" (*id*. at ¶ 17.6).

ART contends that the project buyout license agreement also consisted of the purchase order, L-3's general terms and conditions, supplement 1 to the L-3 general terms and conditions entitled "Government Contract Provisions from the Federal Acquisition Regulation (FAR)," and supplement 2 to the L-3 general terms and conditions entitled "Government Contract Provisions from the Department of Defense Federal Acquisition Regulation (DFAR)" (DuVal Decl. ¶ 18).  Specifically, ART argues that the purchase order was part of the agreement, while L-3 argues that the purchase order was merely used to pay for the license pursuant to government regulations.  A typed provision in the purchase order stated "[t]his Purchase Order issued to obtain one Advanced Rotorcraft License Buy Out in support of the AVCATT-A Program, Contract Number N61339-00-C-0001" (DuVal Decl. Exh. C1).  The purchase order incorporated the terms of the Buyout License Agreement.  L-3 asserts that its standard terms and conditions were attached to the purchase order, not to the project buyout license.  David Cox, L-3's representative in the negotiations, declares that he did not suggest to ART that the

3

**United States District Court**
For the Northern District of California

1   scope of the project buyout license was restricted to the AVCATT-A Program (Cox Decl. ¶ 6).

2   ART's president, Ronald DuVal, declares that ART never would have granted a license

3   allowing its software to be used for any project for the sum of $200,000 (DuVal Decl. ¶ 20).

4   *Flight School XXI*

5        Around 2002, L-3 started working with Computer Science Corporation on a subcontract

6   bid to furnish flight training equipment to the United States Army for its Flight School XXI

7   program (Genna Decl. ¶ 8). The bid was accepted in 2003 (*ibid.*). Flight School XXI planned

8   to use two types of simulators, Operational Flight Trainers and Reconfigurable Collective

9   Training Devices (RCTDs) (*id.* at ¶¶ 8, 12). The Army and L-3 planned to install AVCATT

10  simulators to meet the requirements of the RCTDs (*id.* at ¶ 8). L-3 contracted to supply,

11  support, and maintain three AVCATT simulator suites for the Flight School XXI program (*id.*

12  at ¶ 9).

13       ART had submitted a subcontract bid to supply flight dynamics software for the RCTDs,

14  but L-3 ultimately went with a different subcontractor. ART now declares that the RCTD

15  software for which it submitted a bid was the same technology used in the AVCATT-A

16  program (DuVal Decl. ¶ 32). ART's bid consisted of software very to similar to what they

17  provided for the AVCATT-A Program (*id.* at ¶ 33). L-3 never responded to ART's bid (*id.* at ¶

18  34). L-3 disagrees and points out that the RCTDs had much higher resolution displays and

19  could not train pilots in a team environment. ART asserts that the scope of the Project Buyout

20  License came up during those discussions, but the issue was not resolved (Cox Decl. ¶ 7).

21  ART's representative in the negotiations, David Cox, stated that it did not believe it was

22  required to pay additional license fees for use of the software outside of the AVCATT-A

23  Program so long as the software was used on AVCATT simulators.

24  *Issues of the Scope of the Buyout License*

25       In September 2004, Richard Krance took over responsibility for subcontracting licenses

26  from David Cox (Krance Decl. ¶ 2). Krance contacted DuVal asking for his position on the

27  scope of the project buyout license (*id.* at ¶ 6). DuVal responded (*id.* at Exh. 2):

28          L3 purchased a run-time license buyout for the AVCATT program for $200,000
            that allows you to use the FLIGHTLAB component library on an unlimited

**United States District Court**
For the Northern District of California

> number of target computers purchased by the U.S. Government under the AVCATT program . . . . Even though AVCATT simulators will be used in Flight School XXI, it is a different program from AVCATT and the AVCATT buyout license does not apply to simulators used in the Flight School XXI program.

DuVal also stated that effective October 1, 2004, ART would no longer license the FlightLab software on a per computer basis, but it would license the software on a per helicopter model basis (*ibid.*). The offer was for the same software that was covered under the project buyout license agreement.

L-3 was under a deadline for the Flight School XXI project, so before receiving a response from DuVal, Krance contacted Hossein Saberi, another ART employee. Krance asked if ART could extend the license until the end of the year on FlightLab "as is" with no modifications or extra software, and asked if they intended to charge, and if so, at what price (Krance Decl. Exh. D). Saberi quoted a price of $225,000. L-3 did not respond further to that email. L-3 responded with a letter dated September 24, 2004, stating that it believed it could use the FlightLab software under the project buyout license agreement on additional AVCATT simulators (DuVal Decl. Exh. F). DuVal called Krance several times and informed him that he was incorrect, and that if L-3 persisted, ART would terminate the license and seek legal recourse (*id.* at ¶¶ 29–30).

*Termination of the Project Buyout License Agreement*

Early in 2006, Mike Seaman of L-3 contacted ART to discuss L-3's use of the FlightLab software in the Flight School XXI project (DuVal Decl. ¶ 35). ART and L-3 met face-to-face to discuss the use of the software, but Don Collings, the person with whom ART wanted to discuss the licenses, was not present (*id.* at ¶ 36). Shortly thereafter, DuVal and ART discovered that L-3 intended to use the FlightLab software in its other products, including the HELLCATT simulator (*id.* at ¶ 37). L-3 stated that the HELLCATT was advertised on its website at the relevant time, but that it was only a concept program to be marketed in foreign countries (Genna Decl. ¶ 21). It denied that it intended to use the FlightLab software in that project. Plaintiff emailed defendant informing that its use of the software in the HELLCATT simulator was in breach of the licensing agreement on August 17, 2006 (*id.* at Exh. J). On August 31, 2006, defendant responded, maintaining that it believed that it was authorized to use the software in

5

1   connection with the AVCATT simulators for the Army Flight School XXI project (*id*. at Exh.

2   K).

3         On October 16, 2006, ART announced in a letter to L-3 its intent to terminate the project

4   buyout license agreement (*id*. at Exh. L).  The letter appeared to terminate the license entirely

5   for both the original AVCATT-A Program simulators and for any additional uses of the

6   software.  It also asked for an auditing of any activity associated with the software.  DuVal

7   declares that ART is now competing with L-3 because it has developed its own flight dynamics

8   software (*id*. at ¶ 41).  L-3 denies this, and declares that even if they are competing, ART does

9   not compete with its AVCATT simulators (Genna Decl. ¶ 22).  L-3 has stated that there is no

10  immediately available alternative to the FlightLab software, and that terminating its use of the

11  software would expose it to claims for breach of its obligations to the United States Army and

12  other contractors.  Specifically, it is required to provide an additional eight AVCATT simulator

13  suites and provide service to the simulators already owned by the Army (Genna Decl. ¶ 20).

14  *Procedural History*

15        ART filed this action on October 16, 2006, the same day it informed L-3 of its intent to

16  terminate the project buyout license.  The complaint alleges copyright infringement, unfair

17  competition under California Business & Professions Code Section 17200 *et seq*, breach of

18  contract, and asserts a demand for declaratory judgment.  On December 21, 2006, ART filed a

19  motion for preliminary injunction originally noticed for a hearing on January 25, 2007.  On

20  January 18, 2007, defendant filed an amended answer and counterclaim alleging that plaintiff's

21  terminating the project buyout license constituted breach of contract.  Now, plaintiff requests an

22  order enjoining defendant from using, marketing, offering, selling, reproducing, licensing,

23  developing, distributing, supporting, or maintaining the FlightLab software pursuant to 17

24  U.S.C. 502 and California Business & Professions Code Section 17203.

25        On January 25, 2007, ART filed objections to the declarations of Leonard Genna and

26  David Cox filed in conjunction with L-3's opposition brief.  In particular, the objections

27  attacked portions of Genna's declaration in which he argued that granting the injunction would

28  adversely affect the United States Army's combat readiness and ability to train helicopter pilots.

1   In response, L-3 sought leave to file a sur-reply memorandum addressing the question of the

2   injunction's affect on the Army's ability to train helicopter pilots.  It presented the declaration

3   of Major Phillip E. Smallwood, project director of the Army Aviation Combined Arms Trainer,

4   as well as an additional declaration from Genna.  Leave to file the sur-reply was granted on

5   February 5, 2007.

6           On the same day, defendant filed for leave to file a motion to strike evidence presented

7   in support of plaintiff's reply brief, or in the alternative, leave to file yet another sur-reply

8   memorandum and declaration.  As an initial matter, defendant need not seek leave to file

9   objections to evidence.  On the merits, defendant's motion attacks the reply declaration of

10  Ronald DuVal for introducing evidence for the first time in connection with a reply brief.

11  Though that practice is disfavored, plaintiff had already raised arguments relating to L-3's

12  HELLCATT simulators in its opening brief.  Defendant had already denied the truth of those

13  arguments in its opposition.  Plaintiff's reply brief and declarations merely added additional

14  facts to the same argument.  Defendant's motion to strike is **DENIED**.  At any event, considering

15  the evidence that plaintiff presented in the reply declaration does not change the outcome of this

16  motion.

17                                          **ANALYSIS**

18          To prevail on a motion for a preliminary injunction in the Ninth Circuit:

19      The moving party must show either (1) a combination of probable success on the
        merits and the possibility of irreparable injury, or (2) that serious questions are
20      raised and the balance of hardships tips sharply in favor of the moving party.

21  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839–40 (9th Cir.

22  2001) (citation omitted); *see also Arcamuzi v. Cont'l Air Lines, Inc*., 819 F.2d 935, 937 (9th Cir.

23  1987).  "These standards 'are not separate tests but the outer reaches of a single continuum.'"

24  *Stuhlbarg*, 240 F.3d at 840 (internal citation omitted).

25      **1.      PROBABLE SUCCESS ON THE MERITS.**

26          "[T]he test for a preliminary injunction is 'probable success on the merits' or 'fair

27  chance of success on the merits.'" *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427,

28  1430 (9th Cir. 1995) (internal citations omitted); *see also Republic of the Philippines v. Marcos*,

1   862 F.2d 1355, 1362 (9th Cir. 1988) (finding that probable success equates to a showing of "a

2   fair chance of success").  ART argues that it is entitled to a preliminary injunction on either its

3   copyright-infringement claim or its California unfair competition claim.

### A.   Copyright Infringement.

5       To establish a claim for copyright infringement, plaintiff must prove ownership of the

6   copyright in question, and that defendant violated one of the exclusive rights granted to the

7   copyright's holder.  17 U.S.C. 501(b).  A valid certificate of registration is prima facie evidence

8   of the copyright's validity and ownership.  17 U.S.C. 401(c).  ART has presented a valid

9   certificate of registration listing it as the registrant, author, and owner of the FlightLab software.

10  Accordingly, ART has established the first prong of its copyright claim.

11      Exploitation of copyrighted material outside the scope of the a license constitutes

12  copyright infringement.  Federal copyright law governs the interpretation of the scope of

13  licenses of copyrighted materials.  "Copyright licenses are assumed to prohibit any use not

14  authorized."  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087–88 (9th Cir. 1989).  The crux of

15  the dispute here is whether the project buyout license restricted the use of the FlightLab

16  software to only the AVCATT-A Program, as ART contends, or to any AVCATT simulator, as

17  L-3 contends.

18      The project buyout license agreement itself stated that the type of license granted was a

19  "project buyout license," defined as "a license to run the Licensed Program(s) on an unlimited

20  number of computer systems for use only on a Specified Project"  (DuVal Decl. Exh. C5).  The

21  "Specified Project" was defined as "the specific project for which a Project Buyout License has

22  been obtained."  The "Specified Project" stated was the "Aviation Combined Arms Tactical

23  Training Simulators."  On the license's face, therefore, it appears that it applied to AVCATT

24  simulators in general, not specifically to the AVCATT-A Program.

25      Plaintiff argues that L-3's purchase order indicated otherwise.  The purchase order

26  stated that it was in support of the government contract for the AVCATT-A Program and

27  incorporated the provisions of the license.  It also stated "[t]he price of the license buy out was

28  quoted during the ART proposal for the AVCATT-A Program.  The price of the license buy out

8

**United States District Court**
For the Northern District of California

1   is spread across 3 line items to ammortize [sic] the costs internally . . . ” (*id*. at Exh. C1).

2   Plaintiff argues that this indicated that the project buyout license was granted only for the

3   AVCATT-A Program.  Defendant contends that it drew up the purchase order for accounting

4   purposes to get the government to cut a check to ART.  The nature of the purchase order itself

5   and its references to amortization of the cost support this view.

6        Under the parol evidence rule, terms in a writing  “may be explained or supplemented

7   by the evidence of consistent additional terms unless the writing is intended also as a complete

8   and exclusive statement of the terms of the agreement.”  Cal. Code. Civ. Procedure § 1856(b).

9   The buyout license agreement contained a merger clause stating that it was the entire agreement

10  the two parties.  L-3’s insistence on including terms and conditions of their own undercuts this

11  argument.  Under plaintiff’s view, however, the additional terms in the purchase order were not

12  consistent.  The two documents used two different terms that seem to refer to different things.

13  Elsewhere in the purchase order, it incorporated the terms of the project buyout license

14  agreement.  The purchase order did not state consistent terms that support plaintiff’s view of

15  limiting the license to only the AVCATT-A Project.

16       Plaintiff next argues that “AVCATT” and “AVCATT simulators” are the Army’s terms,

17  not L-3’s terms.  At the time of the buyout license agreement, plaintiff contends, defendant did

18  not make or market any product called an “AVCATT simulator,” there was only the

19  “AVCATT-A Project.”  ART’s usage of the term in its own license belies its argument.  ART

20  drafted the agreement.  Had it wished to do so, it could have stated that the “specified project”

21  was limited to the “AVCATT-A Project.”

22       Finally, ART argues that L-3’s conduct in trying to procure a license for use of the

23  FlightLab software in additional AVCATT simulators shows that it knew that it had exceeded

24  the scope of the license.  L-3’s conduct, however, is certainly open to the interpretation that it

25  was trying to clear up any issues remaining with the license before proceeding with its contract

26  for the Flight School XXI program.  L-3 stated that as the discussions wore on, it was under

27  time pressure to provide simulators for the contract.  Defendant also stated repeatedly that it did

28

1  not believe it needed to pay additional license fees for the simulators used in the Flight School

2  XXI project.

3  　　　　Accordingly, at this early stage, it appears that the project buyout license allows the use

4  of the software in AVCATT simulators and is not limited to the AVCATT-A Project.  ART has

5  not shown a reasonable likelihood of success in showing that L-3's use of the FlightLab

6  software in the Flight School XXI project has exceeded the scope of the license.  ART also

7  accuses L-3 of using the FlightLab software in conjunction with its HELLCATT simulator.

8  L-3, however, states that the HELLCATT is merely a concept, and not an actual product at the

9  current time.  It denies using ART's software with that product.  Such use would clearly exceed

10  the scope of the project buyout license, but plaintiff's mere speculation of future violations are

11  not enough to warrant the drastic remedy of a preliminary injunction.

12  　　　　　　**2.**　　　　**Unfair Competition Under California Business and Professions Code Section 17200.**

13

14  　　　　Section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."

15  Plaintiff alleges that defendant knew of its intent to limit the scope of the license but continued

16  to use the software.  This caused a wrongful interference with plaintiff's ability to license its

17  software to other licensees and wrongfully interfered with plaintiff's ability to sell its services to

18  other users.  In its briefs, L-3 also states that it has suffered injuries including dilution of

19  goodwill, confusion of potential customers, injury to reputation, and diminution in the value of

20  its intellectual property.

21  　　　　Defendant does not dispute that it knew that plaintiff intended to limit the scope of the

22  license, or that it continued to use the software.  It is easy to see how it would affect the license

23  with L-3, but the interference with other licensing opportunities is more problematic.

24  Additionally, ART's employees merely assert that L-3's use has prevented ART from selling or

25  licensing the FlightLab software to other companies.  Those employees cannot identify any

26  specific relationships with which L-3 has interfered.  It is possible that with discovery, ART

27  could find such customers and have more support for its claim, but it has not made a sufficient

28  showing at this time.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

2.    PRESUMPTION OF IRREPARABLE HARM.

In a copyright-infringement action, "a showing of reasonable likelihood of success on the merits raises a presumption of irreparable harm." *Johnson Controls, Inc. v. Phoenix Control Sys. Inc.*, 886 F.2d 1173, 1174 (9th Cir. 1989). The presumption applies only where a disputed term limits the scope of the license. *Sun Microsystems, Inc. v. Microsoft Corp.*, 118 F.3d 1115, 1122 (9th Cir. 1999). Here, the disputed license term does limit the scope of the license; it controls where defendant can use the FlightLab software. As mentioned above, however, plaintiff has failed to show a substantial likelihood of success, so plaintiff is not entitled to a presumption of irreparable harm. Furthermore, because plaintiff has failed to show substantial likelihood of success on the merits, it must make a greater showing of irreparable harm in the balance of hardships.

3.    SUBSTANTIAL QUESTIONS AND BALANCE OF HARDSHIPS.

Plaintiff may be granted a preliminary injunction where there are substantial questions on the merits and the balance of hardships tips sharply in favor of the moving party. *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917 (9th Cir. 2003) (en banc). Even though plaintiff has not shown a substantial likelihood of success on the merits, it has shown that there still exist substantial questions going to merits. Very little discovery has been taken in this case. Plaintiff has raised substantial questions on the merits, particularly regarding plaintiff's allegations that L-3 is using the FlightLab software in projects other than the AVCATT simulators.

"Subjective apprehensions and unsupported predictions . . . are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm." *Carribean Marine Serv. Co. v. Baldrige*, 884 F.2d 668, 675–676 (9th Cir. 1988). Plaintiff argues that L-3's continued use of the FlightLab software injures business relationships, interferes with competition for government contracts, diminishes the value of its intellectual property, and harms ART's reputation. DuVal, ART's president, declares that L-3 is currently competing with ART's flight simulators using its own technology in L-3's HELLCATT simulators. L-3 denies that they are using ART's software in the HELLCATT simulators, and states that the

11

United States District Court

For the Northern District of California

HELLCATT simulator is merely a concept at this point, not an actual product.  Plaintiff's allegations about L-3's interference with other defense contracts and goodwill are attenuated as well.  Plaintiff identifies no projects, other than the one at issue here, in which L-3's activities have harmed them.  Plaintiff may sustain hardship because of defendant's continued use of the FlightLab software, however, plaintiff has not made a strong showing of hardship.

"Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."  *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).  Defendant argues that plaintiff waited more than two years to seek injunctive relief, while plaintiff argues that at most, the delay was only eight months in which it was negotiating with defendant to settle the dispute.  Regardless of whose view of the facts wins the day, parties first discussed the scope of the project buyout license in late 2002 in discussions regarding Flight School XXI.  ART was aware that Flight School XXI intended to use the AVCATT simulators.  ART argues that it did not have actual notice of L-3's use of the FlightLab software until the spring of 2006 when its representatives spoke to L-3's engineers.  ART goes on to accuse L-3 of ducking its attempts to work out the dispute.  This does not, however, eliminate the fact that parties were having disputes about the scope of the license going back to at least 2004.  Accordingly, this factors disfavors plaintiff.

"[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damages award."  *Rent-A-Center, Inc. v. Canyon Television & Appliance*, 944 F.2d 597, 603 (9th Cir. 1987).  The magnitude of plaintiff's hardships is severely undercut by its assertion in its opposition that "presuming defendant were willing to enter into a new licensing arrangement with plaintiff — defendant could even continue using plaintiff's FlightLab Run-Time Software for its flight simulators" (Br. at 17).  In negotiations, most of plaintiff's activities were directed at getting a new license with defendant for its use of the software, not preventing it from competing with ART.  Plaintiff also states that its delay in seeking injunctive relief was so it could seek productive business solutions with defendant.  All of this militates for a finding the plaintiff could be made whole by monetary damages, and will not suffer hardships so severe that they require injunctive relief.

United States District Court

For the Northern District of California

1  Defendant argues that it, and the public interest, would suffer harm if this injunction was

2  granted. The district court may also consider whether the public interest favors plaintiff in

3  determining the balance of hardships. *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959,

4  974 (9th Cir. 2002). Defendant contends that because there is no readily available substitute for

5  the FlightLab software, some of the Army's helicopter training programs would be effectively

6  shut down if this injunction issues. Plaintiff seeks to enjoin defendant from using, marketing,

7  offering, selling, reproducing, licensing, developing, distributing, supporting, or maintaining the

8  FlightLab software. Furthermore, plaintiff has terminated the project buyout license with L-3

9  because L-3 allegedly breached the agreement. Thus, plaintiff's proposed injunction would

10  prevent L-3 from using the FlightLab software in both the AVCATT-A Program simulators and

11  the Flight School XXI simulators.

12  Defendant presents evidence that in addition to exposing it to claims for breach of

13  contract by its suppliers, such an injunction would undermine the combat readiness of military

14  helicopter pilots. Under the AVCATT-A Program, L-3 sold the simulators to the Army, and

15  argues that the Army, as an assignee of the license, would be unable to use the software. This

16  problem could be circumvented by carefully crafting the injunction. Indeed, ART has stated

17  that it only wishes to enjoin *L-3's* activities, not the Army's. More problematic is that L-3

18  provides support for the AVCATT-A Program simulators (Genna Supp. Decl. ¶ 4). Those

19  simulators are operated, supported, and serviced by L-3's engineers, not Army personnel (*ibid.*).

20  As to Flight School XXI, L-3 retains ownership of those simulators, as well as operating,

21  supporting, and maintaining them.

22  Defendant also presents evidence that the AVCATT simulators are key to the combat

23  readiness of military helicopter pilots (Smallwood Decl. ¶ 4). There exists no readily available

24  substitute for the training these simulators provide (*ibid.*). It would take nearly a year to find

25  and install replacement software for the AVCATT simulators (Genna Supp. Decl. ¶ 4). If the

26  simulators were inoperable, more training missions would have to be flown using real aircraft at

27  greatly increased risk and expense.

28

13

**United States District Court**
For the Northern District of California

1    As to the balance of hardships, plaintiff likely has shown that it will suffer some damage

2 to goodwill and its business opportunities if this injunction does not issue.  Plaintiff, however,

3 has indicated that it can be made whole through monetary damages which militates against

4 issuing injunctive relief.  Defendant has shown that issuing an injunction could shut down

5 military training programs that are considered valuable for national defense.  Accordingly,

6 plaintiff has not shown that the balance of hardships tips sharply in its favor.  Plaintiff's motion

7 for preliminary injunction is **DENIED**.

8                                 **CONCLUSION**

9    For all the above-stated reasons, plaintiff's motion for preliminary injunction is **DENIED**.

10 Seeing that no further argument is necessary on this motion, the hearing is hereby **VACATED**.

11

12    **IT IS SO ORDERED.**

13

14 Dated:  February 6, 2007                                _____

15                                                **WILLIAM ALSUP**
                                               **UNITED STATES DISTRICT JUDGE**

16

17

18

19

20

21

22

23

24

25

26

27

28